IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DIANNA L. BASINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIV-13-826-R |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
|   Acting Commissioner of Social | ) | |
|    Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I. Background

Plaintiff previously applied for benefits in August 2007 and did not appeal an initial denial issued by the agency in December 2007. (TR 160, 191, 209). In that application,

1

Plaintiff alleged she became disabled on March 9, 2005, due to back and neck problems, "tennis" elbow in her right arm, and hepatitis C infection. (TR 298).

Plaintiff protectively filed her most recent applications on May 15, 2008, alleging that she became disabled on March 9, 2005, due to back and right arm problems, hepatitis C infection, bipolar disorder, chronic obstructive pulmonary disease ("COPD"), and depression. (TR 165, 170, 212). Plaintiff has a high school education and previously worked as a painter, cashier, bartender, and nurse's aid. (TR 212, 231-236). She alleged that she stopped working on March 9, 2005, due to her conditions. (TR 303).

In an administrative hearing conducted on June 30, 2010, before Administrative Law Judge Gatewood ("ALJ"), Plaintiff testified that she had lived with her parents for more than seven years, had two grown children, and on a typical day she walked to a pond, visited friends and family members, performed some household chores, sometimes cooked meals, cared for her pet, sometimes cared for her three grandchildren, sometimes attended their sports and other extracurricular functions, sometimes went to a casino with a friend, drove almost every day, and had recently attended a family reunion in another state. She stated she had hepatitis C for which she had undergone treatment, fatigue, pain in her shoulders and lower back when vacuuming, numbness in her right leg when driving, "tennis elbow" for which she wore a brace, ganglion cysts, numbness and tingling in her fingers, and limited range of movement in her neck.

Plaintiff testified she did not take pain medications because of her history of drug abuse, but she took anti-inflammatory and nonnarcotic pain medications. She sometimes

2

wore a brace on her back, she had pain in her leg when sitting too long or driving for too long, she had pain and swelling in her knees, and she had pulmonary fibrosis that caused her to "run out of air" when talking. She stated she had depression and bipolar disorder with "pretty constant" mood swings and agitation, and she also took a sleeping aid medication that caused drowsiness. She was restricted by her doctor from overhead lifting, and she had memory loss due to her medications. A vocational expert ("VE") also testified at the hearing.

The ALJ issued a decision in September 2011 in which the ALJ found that Plaintiff met the requirements for Title II disability insurance benefits through March 31, 2006, and had not engaged in substantial gainful activity since March 9, 2005, her alleged disability onset date. (TR 24-25). Following the agency's well-established sequential evaluation process, the ALJ found at step two that Plaintiff had severe impairments before and after March 31, 2006, of lumbar spondylosis, prior right hemilaminectomy at L5-S1, and degenerative cervical disc disease with radiculopathy. (TR 25). The ALJ found that after March 31, 2006, for supplemental security income purposes only, Plaintiff also had hepatitis C infection with history of biopsy and Interferon Ribavirin therapy and major depressive disorder, mild. (TR 25).

At step three, the ALJ found that Plaintiff's impairments did not meet or equal the requirements of a listed impairment. At step four, the ALJ determined that despite her impairments Plaintiff had the residual functional capacity ("RFC") to perform work at the light exertional level involving lifting twenty pounds occasionally and ten pounds frequently, standing and/or walking six hours per workday, sitting for six hours per workday, with no

3

overhead work, and with only occasional climbing, stooping, crouching, or kneeling. (TR 29).

In light of this RFC, the ALJ found that Plaintiff was capable of performing her past relevant work as a cashier as that job is generally performed, according to the VE's testimony and the job information contained in the Dictionary of Occupational Titles. (TR 33). Alternatively, at step five, and again relying on the VE's testimony, the ALJ found that Plaintiff was capable of performing other jobs available in the economy, including the light, unskilled jobs of final inspector, shirt presser, and office helper. (TR 34-35).

Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. Standard of Review

In this case, judicial review of the final Commissioner's decision is limited to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the

4

record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The agency determined that Plaintiff's insured status for the purpose of disability insurance benefits expired on March 31, 2006. (TR 21, 208). Consequently, to be entitled to receive disability insurance benefits, Plaintiff must show that she was "actually disabled [within the meaning of the Social Security Act] prior to the expiration of his insured status" on May 31, 2006. Potter v. Secretary of Health & Human Servs., 905 F.2d 1346, 1349 (10th Cir. 1990)(*per curiam*); accord, Adams v. Chater, 93 F.2d 712, 714 (10th Cir. 1996); Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 360 (10th Cir. 1993).

III. ALJ's Evaluation of Medical Opinions

Plaintiff contends that the ALJ erred in evaluating the medical opinions of treating and consultative physicians appearing in the record. Generally, a treating physician's opinion is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *2). However, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." Pisciotta v. Astrue, 500 F.3d 1074, 1078 (10th Cir. 2007)(internal quotation marks omitted). When an ALJ finds that a treating physician's opinion is not entitled to controlling weight, the ALJ must decide "whether the opinion should be rejected altogether or assigned some lesser weight." Id. at 1077.

5

"Treating source medical opinions not entitled to controlling weight 'are still entitled to deference' and must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927." Newbold v. Colvin, 718 F.3d. 1257, 1265 (10th Cir. 2013)(quoting Watkins, 350 F.3d at 1300).

Plaintiff points to the opinion of Dr. Bisson that she should be limited to work requiring no lifting, pushing, or pulling of more than ten pounds. (TR 901). The medical record reflects that Plaintiff's date of alleged disability onset corresponds with the date in March 2005 on which she suffered an on-the-job injury in March 2005 while lifting a cabinet, and she developed a "sudden onset of low back pain." (TR 397). Five days later, she sought treatment from her primary care physician, Dr. Lacefield, who recommended physical therapy. Plaintiff underwent therapy and also underwent lumbar spine x-rays and a lumbar MRI study. (TR 397). She was referred to Dr. Wienecke by her employer's worker's compensation insurer. Dr. Wienecke evaluated Plaintiff in May 2005. (TR 344-346). In this evaluation, Plaintiff reported she previously underwent a lumbar decompressive procedure at the L5-S1 level of her lumbar spine 18 years earlier.[1] (TR 344). She recovered well from that operation, and she continued to work part-time at the time of the evaluation. (TR 344). Dr. Wienecke noted he reviewed the x-rays and MRI and his diagnostic impression was lumbar spondylosis with mild stenosis at L4-5. (TR 345). The physician did not recommend

---

[1]The ALJ misread the medical record when she stated that "[a]fter conservative treatment, including physical therapy, injections, and medication, failed to alleviate sufficient pain, the claimant underwent a right hemilaminectomy at L5-S1." (TR 25). No such surgical record appears in the medical record.

surgery, recommended referral of Plaintiff to a physiatrist, and imposed a ten pound lifting restriction for Plaintiff's continued half-time work. (TR 345).

Plaintiff then began treatment with Dr. Bisson, a neurosurgeon, through her employer's worker's compensation insurer. Dr. Bisson evaluated Plaintiff in June 2005 and noted Plaintiff stated her low back pain had subsided somewhat but she was beginning to have cervical pain that at times radiated to her right shoulder region. (TR 397). She did not have numbness in her upper and lower extremities or other symptoms. On examination, Dr. Bisson noted she had full range of motion in her upper extremities, negative straight leg raising, good strength in her lower extremities, no sensation deficits, and no muscle atrophy. (TR 398). Dr. Bisson's diagnostic impression was cervical strain and lumbar strain superimposed on a pre-existing condition of lumbar disc degeneration. Dr. Bisson noted his opinion that Plaintiff could "continue gainful employment" and she should undergo additional physical therapy, which she reported had been helpful. (TR 398-399). She was prescribed pain and muscle relaxant medications.

Two months later, Plaintiff returned to Dr. Bisson after completing physical therapy. She complained only of right-sided periscapular pain. (TR 408). She denied numbness or referred pain in her right upper extremity. The diagnostic impression was cervical strain which appeared to be superimposed on a pre-existing condition of cervical degenerative disc disease, thoracic strain, and lumbar strain superimposed upon a pre-existing condition of lumbar disc degeneration. Dr. Bisson recommended referral of Plaintiff to Dr. Marshall to consider a cervical epidural steroid injection or trigger point injection. Dr. Bisson noted she

was not yet able to return to work because there was no "light duty job available to her in the workplace." (TR 408).

Plaintiff received a cervical epidural steroid injection in August 2005 and another injection in September 2005, and she then returned to Dr. Bisson where she reported the injections did not provide much benefit. (TR 354). She complained of cervical pain and numbness in her right upper extremity. (TR 354). She was prescribed nonnarcotic pain and muscle relaxant medications, and Dr. Bisson recommended electrodiagnostic assessment of her right upper extremity to determine whether there was nerve-related impairment. (TR 354-355).

In December 2005, Dr. Bisson noted Plaintiff returned for evaluation and that her electrodiagnostic testing was normal and revealed "no findings . . . for an active radiculopathy, peripheral neuropathy and/or myopathy." (TR 353). Plaintiff's medications were discontinued because of adverse side effects, and Dr. Bisson recommended Plaintiff be re-evaluated by Dr. Wienecke for her continued pain symptoms. (TR 353).

Plaintiff returned to Dr. Wienecke in December 2005. On examination, she exhibited no gross motor deficit and some tenderness to palpation in her neck and interscapular regions. The diagnostic impression was cervical spondylosis most severe at three levels that was "most likely exacerbated by her on the job injury." (TR 341). Dr. Wienecke recommended cervical spine flexion-extension x-rays and noted that if no "gross instability" was reflected on the x-rays he would not recommend surgery. (TR 342). It is not clear from the record whether Plaintiff underwent these recommended x-rays.

8

Plaintiff returned to Dr. Bisson in January 2006 and reported Dr. Wienecke did not recommend surgery. She complained of cervical pain radiating to her shoulders. She was noted to be "very pleasant and in no acute distress," and she exhibited good strength, no muscle atrophy, and no muscle spasms. (TR 885). Dr. Bisson prescribed a sleeping aid medication for Plaintiff and indicated she was ready for a functional capacity evaluation. (TR 885).

In February 2006, Dr. Bisson noted Plaintiff complained of non-radiating cervical, thoracic, and lumbar pain. (TR 904). She was prescribed nerve pain and muscle relaxant medications. Plaintiff returned to Dr. Bisson in March 2006 . Dr. Bisson noted that a functional capacity evaluation of Plaintiff had revealed she was capable of "light category" work activities, but that after considering the evaluation "it is this physician's opinion that this nice lady is in need of permanent work restrictions [consisting] of no lifting, pushing, or pulling of greater than 10 pounds." (TR 901). He recommended that if no work is available with this work restriction then Plaintiff should be provided access to a vocational rehabilitation assessment and that she should also continue non-narcotic prescription medications over the next year "in an effort to keep pain symptoms to a minimum." (TR 902).

The ALJ recognized early in the decision that Dr. Bisson had imposed the ten-pound weight restriction in March 2006. (TR 26). However, when discussing the various medical opinions in the record the ALJ did not expressly consider Dr. Bisson's opinion that Plaintiff was permanently restricted to work not involving lifting over ten pounds. Rather, the ALJ

9

erroneously stated that Plaintiff had been "released" by her doctor to "light work" in March 2006. (TR 32). The regulations define sedentary work as "jobs involving lifting no more than 10 pounds at a time . . . ." 20 C.F.R. §§ 404.1567(a), 416.967(a). The ALJ failed to discuss the permanent lifting restriction imposed by Dr. Bisson, which was consistent with sedentary, not light, work. The ALJ determined that Plaintiff was capable of performing light work, including her previous job as a cashier, and this finding is not consistent with the permanent lifting restriction imposed by Plaintiff's treating neurosurgeon. Consequently, the Commissioner's decision must be reversed for further administrative proceedings in light of this crucial error in the evaluation of the medical opinion of Plaintiff's treating neurosurgeon.

Plaintiff points to the physical RFC assessment by Dr. Woodcock for the agency dated March 25, 2009. (TR 810-816). In this assessment, Dr. Woodcock opined that Plaintiff was capable of performing the requirements of sedentary work with no more than occasional stooping. (TR 810). The ALJ recognized this opinion and the opinion of another consultative physician who found in August 2008 that Plaintiff was capable of performing the requirements of light work. (TR 727). The ALJ may, of course, resolve conflicts in the evidence. But medical opinion evidence is treated differently than other evidence and must be evaluated under the prevailing standard. The ALJ stated only that the medical consultants' opinions were "given some weight. Viewing all of the evidence as a whole, the claimant was limited to light work with no overhead work." (TR 32). The ALJ gave no reasons for discounting Dr. Woodcock's opinion, which was consistent with the opinion of Dr. Bisson concerning Plaintiff's physical functional limitations. This error in the ALJ's

10

evaluation of the evidence warrants reversal and remand for further administrative proceedings.

Plaintiff also points to error in the ALJ's evaluation of "various opinions" in the record by her treating family physician, Dr. Lacefield, concerning Plaintiff's physical and mental limitations and finding that those opinions were entitled to "little weight." (TR 33). Plaintiff recognizes in her brief that the ALJ stated numerous reasons for discounting the credibility of Dr. Lacefield's opinions but argues that those reasons are not supported by the record and that the ALJ did not discuss certain factors, including the length of Plaintiff's treatment relationship with Dr. Lacefield and certain clinical findings in Dr. Lacefield's records of treatment of Plaintiff. Defendant Commissioner argues that the ALJ provided numerous reasons for discounting Dr. Lacefield's opinions and that those reasons are well supported by the record and adequate to support the ALJ's decision.

The record contains an unsigned note from Dr. Lacefield dated June 9, 2008, that sets forth in outline form Plaintiff's medical history, various clinical findings, her "[c]linical course," her medications, diagnoses, and her ability to do work-related mental and physical activities. (TR 538-539). The note describes severe physical limitations, including sitting 20 minutes, walking 10 minutes, standing 10 minutes, no lifting or carrying, and "[l]imited" handling of objects, and the physician states that Plaintiff's mental functional abilities are "[l]imited" by various symptoms. (TR 539).

The record contains two more documents authored by Dr. Lacefield, both bearing the doctor's signature and both dated September 12, 2008. The first of these documents is

11

addressed "To Whom It May Concern" and includes a list of diagnoses, symptoms, clinical findings, and estimates of Plaintiff's mental and physical functional abilities. (TR 748-753). In a narrative statement addressing Plaintiff's mental symptoms, the document sets forth a very lengthy list, such as "involvement in activities that have a high probability of painful consequences which are not recognized in 1999," "emotional lability," "seclusive thinking," "inappropriate affect," "apprehensive expectation," "intense and unstable interpersonal relationships and impulsive and damaging behavior," "recurring and intrusive recollections of a traumatic experience which are a source of marked distress," "psychomotor agitation and retardation," and "perceptual or thinking disturbance." (TR 751).

The second of these documents is a form entitled "Lumbar Spine Residual Functional Capacity Questionnaire." (TR 843). On this form, Dr. Lacefield states that she has been treating Plaintiff since she "re-established" care in 2004 and that her diagnoses are cervical degenerative disc disease, lumbar degenerative disc disease, pulmonary fibrosis, hepatitis C, and bipolar disorder. (TR 843). The doctor sets forth a list of symptoms, a description of neck and low back pain, and "positive objective signs," including decreased neck extension, positive straight leg raising test, tenderness, crepitus, swelling, muscle spasm, muscle weakness, impaired appetite or gastritis, and impaired sleep. (TR 843-844). The doctor describes severe functional limitations on this form, including walking less than one block, sitting 15 minutes, standing 30 minutes, sitting or standing about two hours in an 8-hour workday, she must be able to shift positions at will, she must have unscheduled breaks every 45 minutes for 20 minutes at a time, she can lift less than ten pounds rarely, she must elevate

her legs with prolonged sitting, she can never twist stoop, crouch, or climb ladders, she could only grasp, turn or twist objects for 1% of an 8-hour workday, and she could only use her fingers for fine manipulation for 1% of an 8-hour workday. (TR 844-846). Dr. Lacefield stated that these limitations began on March 9, 2005. (TR 846).

In a third RFC assessment dated November 13, 2008, Dr. Lacefield completed a form questionnaire entitled "Mental Residual Functional Capacity Questionnaire." (TR 832-836). Dr. Lacefield stated on this form that Plaintiff was being treating with a sleeping aid and anti-anxiety medications for "unknown" diagnoses. (TR 832). Dr. Lacefield noted Plaintiff had a "fair" response to the sleeping aid medication and a "good response" to the anti-anxiety medication but that she had almost every symptom listed on the form. (TR 832-933). Dr. Lacefield opined that Plaintiff's mental abilities to perform unskilled work were limited or seriously limited in numerous areas and that she was unable to complete a normal workday and workweek without interruptions from psychologically based symptoms, could not maintain regular attendance or be punctual, could not perform at a consistent pace without an unreasonable number and length of rest periods, and could not deal with normal work stress. (TR 834). Dr. Lacefield also noted on the form that Plaintiff would be absent about one day per month due to anxiety and that she was "overwhelmed by talking to people." (TR 835-836).

The medical record contains office notes of treatment of Plaintiff by Dr. Lacefield after her alleged disability onset date on eleven occasions between January 2006 and June 2008. (TR 694-706). The notes reflect treatment for various conditions, including cervical

13

degenerative disc disease, but Plaintiff did not report neck-related symptoms after March 2007. She was treated in April 2007 for right elbow tendonitis with a support brace. (TR 700). In April 2008, Plaintiff requested a "letter stating she's unable to work due to illness" but she reported she was "feeling ok" that day. (TR 696). The physician noted diagnoses of hepatitis C, COPD, lumbar degenerative disc disease, cervical degenerative disc disease, and iron deficiency, but no meds were prescribed. (TR 696). In June 2008, Plaintiff complained of swelling in her left knee but refused to have her knee evaluated. (TR 694).

Dr. Lacefield does not connect any of her RFC findings with specific clinical or laboratory support, and, as the ALJ noted in the decision, the findings are not consistent with the physician's treatment notes or with other medical evidence in the record, in particular the consultative physical examination of Plaintiff conducted by Dr. Beard in July 2008 and the mental consultative evaluation of Plaintiff conducted by Dr. Poyner in July 2008.[2] (TR 26, 32. 712-713, 719-725). The ALJ provided reasons that are well supported by the record for rejecting the medical opinions by Dr. Lacefield, and no error occurred in the evaluation of this evidence.

IV. Credibility

Plaintiff lastly contends that the ALJ erred in discounting the credibility of her testimony and statements in the record. "Credibility determinations are peculiarly within

---

[2]Plaintiff refers to a third consultative examination of Plaintiff conducted in March 2009 but the exhibits referenced in the decision refer only to the consultative examination of Plaintiff conducted by Dr. Beard in July 2008, which appears twice in the record. (TR 719-721, 804-806).

14

the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). But an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements" in determining a claimant's credibility. SSR 96-7p, 1996 WL 374186, at * 4 (1996). Credibility findings must "be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002)(quotations and alteration omitted).

In this case, the ALJ cited reasons for discounting Plaintiff's credibility. The ALJ pointed to particular inconsistencies between Plaintiff's statements, some of which are invalid. The ALJ stated that while Plaintiff "told the consultative psychologist she was not convicted of the crime [of manufacturing methamphetamine], court records showed she pled guilty to manufacturing methamphetamines, as well as driving while under the influence of drugs." (TR 27). The ALJ did not attach the referenced "court records" to the decision, and no such "court records" appear in the administrative record. As Plaintiff points out in her brief, the public records of this criminal proceeding reflect that Plaintiff was acquitted in a jury trial in 2002 of all charges in that case.[3] Plaintiff correctly informed the consultative psychologist that she was not convicted of the manufacturing charge, and Dr. Poyner noted that her DUI record was from 1996, long before the relevant time period. The Plaintiff was

---

[3]http://www.oscn.net/applications/oscn/GetCaseInformation.asp?submitted=true&viewty pe=caseGeneral&casemasterID=1400461&db=Oklahoma

forthcoming and candid concerning her history of drug abuse, and the ALJ should not have discounted her credibility based on this misinformation. The ALJ also misread the record when she stated that Plaintiff's "statement that she was virus free was in sharp contrast to her reports of failed treatment to Dr. Lacefield, which likely affected the doctor's assessment of [Plaintiff's] condition, abilities, and limitations." (TR 31). The record reflects that Plaintiff's treating physician, Dr. Nguyen, stated in April 2008 that Plaintiff had chronic hepatitis C that had "failed therapy" after 26 weeks of interferonribavirin therapy. (TR 482). Thus, Plaintiff was accurately describing her previous hepatitis C treatment to Dr. Lacefield, and the ALJ should not have discounted her credibility for this reason. Further, the ALJ discounted Plaintiff's credibility for variations in the amount that she advised treating and consultative physicians that she smoked. (TR 31). These minor variations are not significant and should not have affected Plaintiff's credibility. Although the ALJ provided several reasons for discounting Plaintiff's credibility, these very flagrant errors in evaluating Plaintiff's credibility warrant reversal of the Commissioner's decision for further administrative proceedings.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____September 9th_____, 2014, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to

16

this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this        20th        day of        August        , 2014.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE